39, Altana Pharma v. Teva Pharmaceutical Mr. Lee Thank you, Your Honor. May it please the Court, my colleague Mr. Jakes and I represent the appellants Altana and Wyatt. While several months have passed since the district court denied our request for preliminary relief, the need for preliminary injunctive relief in this case remains still important for three reasons. First, Teva and some did not launch any product after denial of preliminary injunctive until approximately four months later. As the briefing has made clear to the Court, at the time of launch, Teva made a one-time launch of product and then stopped. While that one-time launch of product has in fact resulted in the harms which the district court addressed and dismissed, and which we claim are in fact irreparable, including loss of market share and loss of jobs, the threat of an additional introduction, a second launch, remains and can only be addressed if this Court addresses the merits and reverses. Second, the need for preliminary relief is particularly acute in this case because there is no trial scheduled. Indeed, the parties were informed in April of this year that the earliest trial date that the judge had for us was probably mid-2009. That would be two years after the denial of preliminary relief. It would be five years after the action would have commenced. It would be only one year before the patent term expires. If we have a trial in mid-2009, and there is an appeal to this Court, what this means is this. It is likely that the first time this Court could address the question of whether the district court correctly addressed the merits of the obviousness claim will be on an occasion after the patent has expired. And third, we would suggest that addressing the denial of preliminary relief in this case is important because this case and what the district court did was an example of taking the simple principles of KSR, principles that the district court correctly articulated and then attempted to apply, but applied in the difficult and complex area of drug discovery and synthesis. And the issue which has arisen is that KSR is in a case decided on simple mechanical technology with broad principles of obviousness which are more difficult to apply. Mr. Lee, does that really make a difference as to whether or not it's a simple mechanical item or a complex DNA type of an item? It does, Your Honor. It does in the manner in which you address things such as predictable solutions and how you read KSR. And I would suggest that a good indication of that are this Court's opinions in Takeda and Myelin, both of which follow KSR and actually both of which follow some other decisions of this Court applying KSR to simpler technologies. And what Takeda and Myelin both recognize is that in unpredictable sciences and in complex sciences, the manner in which you apply KSR is more challenging and more difficult. But even Takeda, Mr. Lee, speaks to the issue of the most promising compound to modify, doesn't it? Yes. And, Your Honor, if we went to that, there are actually several issues that we have raised concerning the District Court's analysis. One is the burden of proof and the articulation of it, an issue that this Court has addressed in food tech. And a second is the Takeda-Lee compound argument. A third is the manner in which it characterized our harms. And a fourth, and a critical one, is the manner in which it read Bryson. Let me address, too, the Lee compound argument and Bryson to be sure that, in the interest of time, we have fully articulated our position. You are right. Takeda says that you need, as part of the obviousness inquiry of the District Court, to identify the most promising compound. We suggest that the District Court did not do that in identifying compound 12 as the Lee compound. And this is where the manner in which, or the complexity of the technology becomes important. We have to take ourselves back to 1984 when this invention was made. At that time, there was no structure-activity relationship known for PPIs. There was no mechanism of action known for PPIs. Some proton pump inhibitors had been discovered. One had been shown to be a promising gastrointestinal drug. Several drug companies invested millions of dollars and years of time trying to find the next PPI. From those efforts, there are multiple patents. And what we've identified, Your Honor, is, if you just take a handful of them, Altona patents and some others, and identify the compounds that were claimed to be, claimed to have superior properties to Omeprazole, the one compound that had been identified as promising, you'd have approximately 90 different compounds. 90 different compounds that the person of ordinary skill in the art would be looking at trying to identify the most promising. From that group, there is no reason that that person of ordinary skill in the art would have identified Compound 12. In fact, if you go to the chart in the 518 patent where Compound 12 is listed, there are 18 different compounds that are disclosed, which would have been known to one of ordinary skill in the art. For those 18 compounds, Compound 12 is better than some, worse than others. Now, the district court said, well, it appears that Compound 12 was as good as or better than others in terms of potency. What about the sex reference, as far as motivation of the compounds are concerned? Well, Your Honor, the lynchpins upon which the district court's finding was built are three. First is the most promising compound to modify would be Compound 12. If you don't get there, you don't move to Steps 2 and 3. Step 2, which is an issue that was debated but which we haven't challenged here, is the suggestion that that would have motivated someone to take Compound 12 and develop a product that had a PKA of 4. There's a fight about it, but we're not going to be challenged here. The question then becomes the third portion, which is how do you get to the PKA of 4? What the district court did at the urging of the defendants is take a 1960 reference, a reference that was dated 24 years before the invention and had nothing to do with PPIs and said, this teaches you how to get to a PKA of 4. So that is the logic. Compound 12, Saks says PKA of 4, Bryson teaches you how to get to a PKA of 4. The key on this appeal, recognizing the burden we have in challenging the denial of a criminal injunction, and if we were to ask the court, leave the court with nothing else, is to compare what the judge said at page A19 to page A4629, which is the table. And what Judge Lanara says at that page is, Bryson teaches you how to get to a PKA of 4. That is not correct. If you look at A4629 table 1, what Bryson teaches you is to get to a PKA of 4.83 or 4.91, which is an average of 4.87. What page are you reading from? A4629, Your Honor. Oh, 629? A4629 in table 1, which is a table from Bryson. That's the Bryson article? That's the Bryson article, Your Honor. And it's table 1, A4629, and it's page 4872 of Bryson. Now, remembering that what Judge Lanara said was, Sachs tells you to get to a PKA of 4, and this is telling you how to get there. Now, Judge Garrison, to go to your question, this is an article that's describing modifications on a simple pyridine ring with all the complications of the benzimidazole portion, methyl sulfonyl bridge. That's where the complexity of the science matters. But even if I set that aside, if you look at table 1, you will see the methyl about three-quarters of the way down, and the numbers for the methyl are 4.83 and 4.91. They're the two figures immediately above 3ClCH3. That's for the methoxy. So they're saying that if you substitute the methoxy for the methyl, you will get a PKA of 4. But what the article tells you is you get a PKA of 4.87. Why does that matter? This is not rounding or sampling or getting close, as the defendant suggests. The difference between 4.87 and 4 is a big difference. In fact, if you look at that same table, the difference between the methyl and the methoxy, which is what they're comparing, is about 0.8. So on the one hand, they're saying, well, 0.8 is a big enough difference. But on the other, they're saying, well, when the judge rounded 4.87 to 4, it's just a rounding error. But it's more than just not being close. This 4.87 is on a logarithmic scale. It's not on a normal scale. 4.87 rounded to 4 on a normal scale itself, we would suggest, is a clear factual error. But here, you've taken 4.87, rounded it to 4. And as the people who are better at math than I am tell me, that means that the difference is 10 to the 0.87 power or a 7.4 difference. In effect, calling 4.87 the same as 4 is the equivalent, the mathematical equivalent, of saying 74,000 equals 10,000. And that simply is not correct. And without that finding on Bryson, without that factual finding, there was no substantial question inserting validity. And to suggest, Your Honors, why this matter, let me quote from A3290, which is a Teva brief filed at the district court. Quote, a compound with a pKa of 4 would be relatively stable at pH 5, but a compound with a pKa of 5 would be relatively unstable at pH 5. So if we step back from all the details, we know that both parties say that there's a big difference between a pKa of 5 and a pKa of 4. Your Honor, that's what they suggest Sachs teaches you. Now, actually, if you read Sachs' entirety, Sachs actually says, if you want a compound that has a pKa of 4, go get Omeprazole, which is, in fact, the prior art. But they tell you that that difference is significant. Then the difference that Bryson has on its face, 4.87 to 4, is a significant difference and cannot establish the third portion of the obviousness of 10. So if you take the three pillars, identification of a lead compound, identifying the compound most significant to modify from a universe of thousands, but certainly at least 90, taking Sachs as we've taken it for purposes of appeal, but getting to Bryson, there was no substantial question concerning validity. But is there any dispute? Did you dispute at all? This is one aspect that bothers me about the situation. There is no dispute from district courts finding that Sachs presented the requisite motivation for one to modify compound 12 to create the Pentrazole. Your Honor, I would phrase it this way. To the extent the district court said that you would take compound 12 and Sachs would provide a motivation to modify it to obtain a pKa of 4, we haven't disputed that for purposes of this appeal. There were underlying debates about Sachs that didn't seem necessary. But then, let's say you get there. Let's say you got compound 12. Let's say that you had a reason to get to pKa of 4. The question still is, how do you get there? And that's where Bryson doesn't... The only thing they had to get them there was Bryson. And Your Honor, the best indication that Bryson's a problem is no one, none of the people at these two tables tries to equate 4.87 to 4. The arguments from the other side are twofold. First, it's close enough to 4. Mathematically and scientifically, that's not true. The second is, well, Judge Linares actually wasn't saying that Sachs told you to get to a pKa of 4. They now recast Judge Linares' opinion to say, he said, well, get a lower pKa. Bryson tells you how to lower it. But that's not what Judge Linares said. And if you consider what Judge Linares said at pages A-19 and A-20 of his opinion, he is clear that his logic and his analysis requires you to get to a pKa of 4. But we are still in the preliminary stage, so it's not a question of establishing invalidity of the patent. It's really just creating a substantial issue of validity. Your Honor, this is, if I can answer the question, Your Honor. Yes, please do. Your Honor, this is, in some sense, a question in VUTA. And I understand that we appear to be quarreling with a number of things that Judge Linares did. And in fact, we are. On the burden of proof, I think he went one step too far considering VUTA. Without a doubt, we have the burden of demonstrating a likelihood of succeeding on the merits. But that doesn't change. The ultimate burden, which they bear to demonstrate the patent, was obvious by clearly convincing evidence. Even in VUTA, this court articulated it as a substantial question concerning the validity of the patent. Judge Linares went one step further and said what that meant was, on a preliminary injunction, we had to show that they defensively asserted a lack of substantial merit. There is a difference between the two. And we suggest that even if you apply VUTA, and there was a dissent in VUTA, but if you take the majority in VUTA, the standard is a substantial question of validity. Without pricing, without compound default, there is no substantial question of validity in this record. Thank you. OK. We'll save you rebuttal time, Mr. Lee. OK, let's see. Mr. Schuman is going first. Proceed. May it please the court. This is a case where the district court is entitled to great deference, and he should be affirmed. The district court in this case very carefully decided this issue. It took a lot of evidence. He took over 1,000 pages of evidence, difficult medical journals, difficult chemical journals, testimony in the form of declarations from experts that were over 100 pages long. He received hundreds of pages of attorney argument commenting on the experts, commenting on the evidence. He held a full day hearing in this case and a review of that hearing shows he was well prepared for that hearing. He had specific questions that he wanted the parties to answer, and he went after answers to those questions throughout the day, as well as taking testimony from the other attorneys who were there. Following all of that, he issued a 27-page opinion. It's very thorough. It's very complete. It's very logical. It contains no clearly reversible errors of fact. And it's correct on the law. He did not abuse his discretion in denying the preliminary injunction, and he should be entitled to that great deference that he has with his discretion. Now, in deciding the issue of whether to deny or grant the preliminary injunction, the judge looked at two of the four factors. He looked at the likelihood of success, and he looked at the irreparable harm. And he found that both of them were lacking in this case. Now, either one of them under the case law would have been sufficient for the district court to deny the preliminary injunction, either one. But in this case, he found that both were missing. And in his discretion, then, he denied the preliminary injunction. So in order for this court to reverse, you will have to find that plaintiffs have met their burden and that the judge committed a reversible error on both. Both of those two factors. Now, I'd like to first turn to... Is the standard clear error on this point? No. What is it? The question is whether the patent is now vulnerable, whether we have shown some vulnerability to the patent, whether our case lacks substantial merit. There's another way that it's put. And that's a burden that's on the court. Don't you have to show a likelihood of success ultimately at trial? At trial, I would have to show the patent invalid. But at this stage, it's a preliminary stage, and my burden under the Amazon.com case is a lesser burden. It's one of showing that the patent is vulnerable, one that shows that I have a substantial case, because this is a preliminary proceeding. It's not a final proceeding where we have gone to a jury or where we have gone through a full trial to a judge. And that is the difference between what you have in the trial, where you have the clearance limits and the evidence standard, and here where you have... I agree. Our precedent is conflicting on that. We have precedent which says that for preliminary relief, you need to show that you're likely to succeed at trial, particularly if what you're seeking to achieve is a change in the status quo rather than a preservation in the status quo. Do you think that makes any difference? I think in this case that the Amazon.com decision is what should apply in this case, that we should be looking at the vulnerability of the patent and that the clear and convincing evidence standard is reserved for later on in the proceeding. That doesn't mean that the district court can disregard the presumptions of validity and concepts of proof and who has the burden of proof, but he didn't do that in this case. In this case, the district court examined, for instance, the Sachs article and the Bryson article, and he found that they were not before the patent office, and so there wasn't such a high burden on the defendant to show validity as there would be had they been in front of the examiner and been examined during the prosecution. So the judge in this case was fully aware of the presumption of validity and the burdens of proof in this case and took those into account. If I could, Your Honors, I'd like to get into the likelihood of success, the validity of the patent, because the plaintiff here, the appellant, sets up a straw man and then tries to knock it down, but what happens is he hasn't really encapsulated the judge's opinion. The judge's opinion is much broader, and the judge's characterization of the art and the teachings of the art is much broader than what you'll find being described in the appellant's brief. For one, Sack's article is not limited to just teaching that you must reach a PKA of 4. First of all, the evidence in the case was much broader. Teva's expert, Dr. Mitcher, had 10 paragraphs in his declaration indicating that the teaching of Sack's reference  would have been to lower the PKA, lower the PKA to increase the stability. Now, the district court adopted that reasoning. For instance, at page 17 of the opinion, which is appendix 18, the judge writes, and he's giving this broader interpretation, he says, Defendants further argue that the Sack's article suggested that to lower the PKA of a compound, one should lower the PKA of a nitrogen ring. He then goes on to discuss the plaintiff's argument and concludes the paragraph by saying, The court finds that the defendant's interpretation of the Sack's article is sufficiently persuasive to raise a substantial question of obviousness at this stage of the proceeding. He's not talking about PKA of 4. He has adopted Teva's expert's analysis of what Sack's taught, that PKA lowering results in better stability. Now, this is not the only case in the opinion. We also find it at page 8, 21, page 20 of the opinion. There, the district court writes, If Sack's teaches PH5 stability via lowering of the PKA of a pyridine ring, and Bryson teaches how to lower the PKA, then the purport of the unexpected property  So, are you telling us that, therefore, the selection of Compound 12 would have been done with confidence that it would be a successful product? The selection of Compound 12 is a different issue. I was speaking about the motivation for modifying Compound 12, but Compound 12 is an interesting situation. But it's fundamental, isn't it? Because if you don't have Compound 12 as based on the prior art, saying this is it, this is the compound that will succeed, where are you with your motivation? Well, I suggest, first of all, that Compound 12 was the plaintiff's own patent. They made statements in the patent that they can't back away from. They made statements to the public. And in particular, they gave 18 examples of compounds that were useful in that invention, and they described each and every one of those 18 compounds at column 24 of the patent, of the 518 patent, as having excellent, excellent cytoprotective effect on the stomach and gastric secretion inhibiting action, and that they were better than the prior art. They didn't distinguish between Compound 12 or Compound 1 or Compound 14 or 16. They themselves, El Tano, the plaintiffs in this case, told the world these 18 compounds were excellent and were better than the prior art. And as it turns out, the 518 patent was the state-of-the-art at the time. It was the most recent patent on the block. They can't back away from those statements. Now, furthermore, we heard in the opening argument that the plaintiffs now claim you must have the best lead compound. But I direct your attention to page 3 of their reply brief, where they state unequivocally that that is not their argument on appeal, that they are not arguing that you must have the best compound at all. Actually, to cater requires a most promising compound, and then you must determine whether it's obvious to modify that compound. We have that here. The district court looked at the Compound 12. He had good reason to pick it as a lead compound. It was the most promising. It was described as excellent. The actual description of the motivation was in Sachs. What he said was, Sachs teaches one of Ormear's skill in art to lower the PKA to increase the stability, supported by the evidence. And then he said, Bryson teaches one how to lower the PKA. Now... Well, pardon me. He actually said... He went on and started at... It was page 18 of the judgment, A-19. He actually talked about that Bryson's article taught how to lower the PKA to 4. I mean, he was very specific. He went on and said it twice, and then he makes the statement on page 19, Bryson undisputably taught that a compound with a methoxy group at the 3 position would have a lower PKA value, namely a PKA of 4. Do you dispute Mr. Lee's argument about the significant difference between a PKA of 4 and a PKA of an average of 4.86? I do in this context, because let's look at the context of that sentence that you're reading, Your Honor. Bear in mind that the judge is talking about trends. Do I lower or raise the PKA? The PKA statement you're looking at here is in parentheticals in that sentence. What do parentheticals do? They illustrate the point that's being made prior to that. Let's read the sentence without the parenthetical. Here's what he says. Bryson undisputedly taught that a compound with a methoxy group at the 3 position of the purity ring would have a lower PKA value than a compound with a methyl group at that position. And then he uses as illustration a description of the PKA of 4 of Bryson. He did not need to have the precision of 2 decimal places. He was comparing PKA of 5, which you saw on the previous page for a methyl group, versus PKA of 4, which was lower, to one of a methoxy group. If he had put a decimal place in there, then he would have been liable to be criticized for being too precise that Bryson somehow allowed you to get down to those precise PKAs, which he knew was not the case. He knew that the teaching of Bryson was to lower PKA in a direction that headed toward 0. He was going from 5 to 4. I think the district court knew how to write 4.82, if he chose to, and he knew he had Bryson in front of him. What he was trying to tell the reader was that this is a directional thing. I'm trying to get across that I'm going from 5, a methyl group, to 4, a methoxy group. He did not need that precision. Now, Judge, I'm cutting into my time, and I need to give my opponent, my co-counsel, some time to deal with his analysis. Okay. Thank you, Mr. Shuman. Mr. Stewart, you have about three minutes. Thank you. I'm trying to be very fast and brief. I'm going to address the double-patenting issue on the different patent, the 230 patent, which was not addressed by the district court in his decision. Then why is that before us? Because it was addressed... It was fully briefed in the district court. It was fully briefed in this case, and it was an issue... If this court were to reverse or remand on the obviousness and irreparable harm issue, you must address it at that point. And I suggest that this court should consider it, because this case is scheduled for a jury trial, which is going to take probably six weeks to do or more, and that issue will come up in a jury trial. And if the district court rules incorrectly on the law, and, in fact, the district court did appear to have some uncertainty as to what the law was on the double-patenting issue, then we're going to have to do two jury trials each six weeks. You want us to make an original finding on this point? Did you request reconsideration by the district court of this issue? We did not request reconsideration, but we did brief it to the district court. We briefed it in this court. And I suggest that if this court were to reverse on any ground, then you must deal with that issue, because that was raised below. And the case of U.S. against American Railway Supreme Court case says, which we cite in our brief, it says that if an issue was raised in the district in the lower court and not addressed by the lower court, then it must be addressed above if the other issues are not resolved, are not affirmed in the appellate court. Well, proceed. You have about a minute on this point. Okay, I'll be very fast. On this double-patenting issue, it's a different compound. And on double-patenting, you have to compare claims. And in the claims, no motivation is required when you're doing double-patenting for picking the initial compound. All you need is, in effect, the prior compound has to be in a claim. It is in a claim. It's in the 230 patent, claim 12, and it's compound 4. And the only difference between compound 4 and pantofazol is that compound 4 has two methyl groups and pantofazol has two hydrogen groups. Well, how can that be double-patenting? Excuse me? If they're different compounds, how can it be double-patenting? Because the test for double-patenting is obvious in this type of double-patenting. And the test for double-patenting is whether the two compounds are obvious variants of one another, if they're obvious qualitative equivalents. And we've cited in our brief more than a dozen patents that show that you can make that very substitution on a benzimidazole-pyridine proton pump inhibitor compound. Okay, well now you're out of time, but I do have a question. This issue here is on the denial of the request for a preliminary injunction. Are you saying that you are absolutely precluded from obtaining whatever clarification or whatever else you might need before proceeding with trial on remand? I'm not aware of any other way to do it. Okay, we'll take it under advisement. Thank you, Mr. Stewart. Mr. Lee. Briefly, Your Honor. The standard is of use of discretion. We recognize the time that Judge Linares and the effort he put in to reaching a determination, and that's why the standard is clear error. But here there are several. One is the lead compound, and if you listen to the argument, the argument was in a 518 patent there are 18 compounds that are said to have better characteristics in omeprazole. That does not make a lead compound, particularly when taken with the other patents which were known to one of the prior arts. The fact that one is last and one is first doesn't matter. But even more critically, on Bryson, if we go to the page just before the page that Judge Ward's on, page 18, this is not directional. I could read what Judge Linares said as two of his three analytical mentions. At the end of the first partial paragraph, the court preliminarily finds that Sachs presented the requisite motivation for one to modify compound 12 to pantoprazole by lowering the pKa of the puriting ring to a pKa of 4. It's more than just directional. In fact, if the court considers appendix page 1160, which is the Sachs article, you will see just why he said this. Sachs wasn't talking directionally. He was talking specifically of pKa of 4. And that's why just five lines later in the opinion, Judge Linares says, according to Bryson, the pKa value of a methoxy group at such position is 4. However, the pKa of a methyl group at this position is 5. It's critical. Neither counsel disputed the difference between 4.87 and 4 as a scientific matter. There's an argument that it's unimportant because it's directional, but in answer to your question, Judge Ward, no one has said the difference between 74,000 and 10,000 isn't significant. Now, two last points. The irreparable harm that the court considered was addressed in a number of different ways, but one way the court addressed it was to categorically dismiss loss of revenue, price erosion, loss of jobs as not irreparable harm under Lilly. We suggest respectfully that that's an over-reading of Lilly. Lilly was dealing specifically with a question in Judge Bryson's opinion of whether loss of an opportunity to research is irreparable. It did not address broadly loss of revenue, price erosion, loss of market share, loss of jobs. Some of that harm has occurred. The second is a plenary injunction is a moving picture. The case remains pending. There is marketplace activity happening today. If the decision on the question of validity was wrong, then the district court should reconsider the question of irreparable harm in light of that. Lastly, on double patenting, that's something that the district court should consider in the first instance itself. It hasn't as a consequence. There's no identification of a lead compound. There's no identification of a motivation combined. There's no reason that someone would go to the benzimidazole ring and take the two methyls off. Going very lastly to the question Judge Newman just asked, there is a need to clarify whether the district court's reasoning on the validity of the patent is correct for two reasons. One, without reiterating where I started, it is because the question of preliminary relief remains important on the facts of this case. The second is, if we're left in a circumstance where there's a trial in 2009, and after trial and post-trial motions, we don't come back to this court until that patent expires, then it's critically important that the proper framework, the proper analytical framework to decide the issue of obviousness be provided to the district court in advance of the trial. Thank you. Thank you, Mr. Lee, Mr. Schuman, Mr. Stewart. The case is taken under submission. All rise. The honorable court is adjourned until tomorrow morning at 10 o'clock a.m.